*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HOGGETT, Minor.

UNPUBLISHED
August 25, 2022

No. 358660
Baraga Probate Court
LC No. 2019-008077-GM

Before: LETICA, P.J., and MARKEY and O'BRIEN, JJ.

LETICA, P.J. (*concurring in part; dissenting in part*).

As discussed by the majority, although this is an appeal from the probate court's order denying appellant's (mother's) motion to terminate a guardianship, mother challenges the 2019 order granting appellee's (grandmother's) petition for guardianship over her granddaughter AH. Whether mother can raise such a challenge from an order denying her petition to terminate the guardianship is a question the Supreme Court previously declined to address after it initially scheduled oral argument to determine whether *In re Ferranti*, 504 Mich 1; 934 NW2d 610 (2019),[1] applied to guardianship proceedings. *In re Orta*, unpublished per curiam opinion of the Court of Appeals, issued February 4, 2020 (Docket Nos. 346399 and 346400), *In re Guardianship of Orta*, order scheduling oral argument 505 Mich 1137; 944 NW2d 918 (2020), lv den 508 Mich 913; 962 NW2d 844 (2021). As a panel member in *In re Orta* and under the circumstances presented in that case, I answered the question affirmatively. *Id*. Notably, three Supreme Court justices in *In re Guardianship of Orta* expressed concern regarding the "problems that may arise because this state does not afford parents the right . . . to the assistance of counsel at guardianship proceedings." *In re Guardianship of Orta*, 508 Mich at 845 (CAVANAGH, J., concurring). Those problems are evident in this case.

---

[1] In *Ferranti*, 504 Mich at 22-29, the Supreme Court held that a parent's appeal of an adjudication error from an order terminating his or her parental rights is not a collateral attack, and thus, the collateral-bar rule does not apply in a single child-protective case.

-1-

## I. FACTUAL BACKGROUND

### A. THE CHILD-SUPPORT CASE

In 2016, 24-year-old mother and 22-year-old Jarrad Hoggett (father) were in a relationship when mother gave birth to AH. Father moved to Texas when AH was about 18 months old. Mother and AH continued to live in a separate abode on grandmother's property.

In 2018, mother filed a support action against father.[2] The court awarded mother sole legal and physical custody and ordered father to support AH financially.[3]

Grandmother would later testify that mother was a special education student while attending Baraga schools. When mother was young, she was diagnosed with learning disabilities, an anger issue, and Attention Deficient Disorder (ADD). Even so, mother graduated from high school. Although a teacher had explained that grandmother could petition for guardianship based on mother's "developmental disability," grandmother opted not to. Instead, she offered to provide mother a rent-free property and act as her support system because grandmother wanted mother to be independent.

At some point, mother began a new relationship. Grandmother disapproved. In April 2019, mother moved to Marquette County with AH into in a home that belonged to mother's boyfriend's mother. The distance between the two homes was about 80 miles. Contact with grandmother declined.

### B. GRANDPARENT VISITATION

Grandmother soon moved to intervene in the Baraga County support case and requested grandparent visitation after her failed attempt to have the Marquette County Department of Health and Human Services (DHHS) step in. Children's Protective Services (CPS) concluded there were no concerns because AH was happy and healthy.

After a hearing,[4] the court granted grandmother grandparent visitation. Mother did not react well, causing a scene in the courtroom and acting out thereafter. The court-ordered exchange

---

[2] The entire record of that proceeding has not been provided.

[3] This order is not included in the record.

[4] This transcript has not been provided. The failure to file transcripts relevant to an issue on appeal may waive appellate review. *Leelanau Co Sheriff v Kiessel*, 297 Mich App 285, 289; 824 NW2d 576 (2012). But, when the question on appeal presents a legal question reviewed de novo and the missing transcript is not relevant to the issue on appeal, a party does not necessarily waive her right to appellate review. *Id*.

of AH necessitated the intervention of the Marquette County Sheriff's Department and resulted in criminal charges against mother.[5]

## C. GRANDMOTHER'S EX PARTE EMERGENCY MOTION FOR CUSTODY IN THE CHILD SUPPORT CASE

Mother would soon pay an even higher price—the care and custody of AH. On Friday, September 13, 2019, the day after the grandparent-visitation exchange, grandmother, who was represented by counsel, filed an ex parte emergency motion for temporary custody in the support case. Grandmother detailed mother's actions during the exchange, which grandmother had also reported to the Marquette County DHHS. Grandmother mentioned that there had "been prior CPS cases and reports on the [Marquette] home regarding cleanliness."[6] Grandmother noted that when mother opened the door to the Marquette home, it smelled like a chicken coop. Upon arrival at grandmother's home, grandmother bathed AH and washed her clothes. Moreover, mother's boyfriend texted grandmother's fiancé at 12:02 a.m., stating it was their fault that his dog was dead[7] and informed them that they were no longer welcome on the Marquette property.

Recognizing that the grandparent-visitation order required grandmother to return AH to mother on Sunday at 9 a.m., grandmother asked for an "ex parte emergency order granting temporary physical custody of [AH] until further hearing can be made about the fitness of [the] custodians and the home that [AH] was in." Grandmother added that "providing notice of this motion to [mother] will only result in further outbursts and potential violent behaviors. The order must be issued ex parte to [e]nsure no one is injured or threatened as a result of [the] filing[.]"[8] Grandmother averred that mother "admitted to making threats about taking [AH] and never letting [grandmother] or her family see her again." Grandmother was fearful "that if [the] order . . . [was] not granted, [mother] will take [AH] and abscond with her and she will be unable to be found."[9] Grandmother provided a proposed order for the court.

That day, Houghton County Probate Judge Fraser T. Strome signed grandmother's proposed order for Judge Timothy S. Brennan, Baraga Circuit Court Judge – Family Division. The order stated that upon review of the information in grandmother's verified motion, AH would

---

[5] Mother asserts that the criminal matter was resolved without jail time, but it was pending during the proceedings held below.

[6] Grandmother did not explain that Marquette County DHHS had declined to become involved regarding these reports.

[7] The dog bit the police officer and was destroyed.

[8] Grandmother had obtained a personal protection order (PPO) against mother as well as mother's boyfriend, but did not mention this.

[9] It is unclear why mother would object to having AH returned to her custody and whether mother had the resources to actually disappear with AH. In fact, at some point, mother was arrested based on her actions during the grandparent-visitation exchange and posted bond that would have required her to seek court approval before leaving the state. See MCR 6.106(D)(1).

"remain in care and custody of [grandmother] pending further hearing on the allegations outlined in the motion as that is in [AH's] best interest and for her safety and well-being."

Consistent with MCR 3.207(B)(5), a notice provided with the order informed mother that she could file a written objection or file a motion to rescind it within fourteen days. If mother filed a written objection, the Friend of the Court (FOC) had to try to resolve the dispute. If the FOC could not, and mother wished to bring the matter before the court without the assistance of counsel, the FOC had to provide her with form pleadings and written instructions and schedule a hearing with the court. If mother failed to file an objection or motion, the ex parte order would automatically become a temporary order. And, even if mother objected, the ex parte order would "remain in effect and [had to] be obeyed unless changed by a later court order."

Mother timely objected.

## D. GRANDMOTHER PETITIONS FOR GUARDIANSHIP

On September 27, 2019, exactly two weeks after grandmother filed her ex parte emergency motion for temporary custody in the support case, but before the hearing on mother's objection, grandmother petitioned for appointment of a guardian for AH, stating "[t]he minor is in need of a guardian because . . . the parental rights of both parents or of the surviving parent have been terminated or suspended by . . . a previous court order other than an order appointing a limited guardian of the minor." Grandmother repeated her earlier allegations and provided a copy of the police report and bodycam footage of the exchange.[10] Grandmother added that AH's biological father supported grandmother's request for guardianship. Grandmother requested an "emergency temporary order granting her guardianship over [AH] until a hearing [could] be held on her petition."

Three days later, the probate court appointed a lawyer-guardian ad litem (L-GAL) for AH in the guardianship case and directed a written report to be prepared. In an October 1, 2019 email, the L-GAL reported that "[t]he [Marquette County] CPS investigation is not going anywhere so there will be no action there." Although the L-GAL had spoken to grandmother's attorney, he had not spoken to mother because her phone was disconnected and he had not called father. The L-GAL indicated that the custody order seemed to protect AH until that matter could be resolved and, therefore, the L-GAL did not see the current situation as an emergency. After speaking to all the parties, the L-GAL indicated that he would provide a report to the court.

Later that same day, Judge Strome denied grandmother's request for the appointment of a temporary guardian. Given the L-GAL's recommendation, the court found that "no emergency exist[ed] that would require the appointment of a temporary guardian." The court directed that the guardianship petition be scheduled for a hearing, and a hearing date of October 30 was set.

In the interim, on October 9, mother and grandmother met with Brenda Caldwell, who facilitated the court-ordered mediation in the support matter. According to Caldwell, they were making progress before mother became repetitive in her demands, eventually leading to

---

[10] Neither of these items are included in the file and neither have been provided for our review.

grandmother to say, "I think we're done here." Mother wanted AH returned that day and also demanded $100 for gas money because mother did not have enough gasoline to return to Marquette. From mother's perspective, grandmother wanted mother and AH to move back to Baraga County, but mother had a new life in Marquette and did not want to be under grandmother's control. Mother further opined that grandmother had failed her in certain respects. Grandmother, on the other hand, later testified that she was disappointed mother was more concerned about securing the $100 to return her boyfriend's truck so that he would not be late for work than spending the afternoon with AH, whom she had not seen since September 12. Mother explained her reluctance to visit was rooted in her fear of violating grandmother's PPO. Although Caldwell offered to amend the PPO, mother remained distrustful and was concerned that she would end up in jail.

On October 30, 2019, the date scheduled for the hearing on the guardianship petition, Judge Timothy S. Brennan, who was the probate judge and the presiding judge in the Family Division, decided to hear mother's objection to the entry of the ex parte order of temporary custody in the support matter[11] in addition to the guardianship petition. The court opined that if it granted the guardianship, mother's objection to the custody order was "immaterial." To grant the guardianship, the court stated that it would have to determine that the parties consented to it or that the parent or parents were unfit. At grandmother's counsel's request, the court took judicial notice of the hearing that occurred as the result of grandmother's earlier motion for grandparent visitation in the support case.[12] The court had presided over that hearing and said "it would be hard to forget." Additionally, grandmother alleged that the court had come close to finding mother was unfit during that hearing.

During the hearing, Marquette County Sheriff's Department Corporal Torin Tredeau testified about mother's actions during the exchange pursuant to the grandparent-visitation order. His bodycam footage was admitted and showed that mother repeatedly stated her intent not to comply with the grandparent-visitation order. Mother's dog[13] bit the corporal and he had to take mother to the ground. Mother was charged with one felony and one misdemeanor.[14]

---

[11] MCR 3.207(B)(6) requires a hearing on the ex parte motion to be held within 21 days after an objection or motion and request are filed. Mother objected within the 14-day timeframe that ended on September 27, but the hearing was not held until October 30. The notice provided with the temporary custody order indicated that FOC was supposed to schedule the hearing given that mother objected to the ex parte order, the FOC failed to resolve the dispute, and mother was without counsel.

[12] See footnote 4.

[13] The dog belonged to mother's boyfriend.

[14] The record suggests that mother was arrested for resisting and obstructing a police officer and assaulting grandmother's fiancé. On appeal, mother asserts that those matters have been resolved without jail time; however, the charges remained pending during the proceedings below.

Corporal Tredeau was also aware of numerous reports about geese, chickens, dogs, and other animals living in the Marquette home. But the officer did not smell anything that night as he was recovering from a cold.

Mother did not have any questions for the officer, but made a statement that baby chickens had been inside the home due to their age and had since moved outside. Mother added that, if there was an odor, it came from the neighbors who did not clean their pen.

Grandmother testified about the clothing she had removed from AH, including some that she bagged after the exchange.[15] She described this item as having "filth" on it and opined that it smelled of cat urine. The clothing was admitted. When mother was asked if she had an objection to this exhibit, she claimed the odor was due to marijuana her boyfriend used.

In addition to be concerned about mother's standards regarding cleanliness, grandmother was also concerned about mother's ability to provide financially for AH in light of her request for the $100 during the FOC mediation.

Grandmother further testified that mother had asked the State Police for a welfare check on Friday and the Sheriff's Department for a welfare check on Saturday after the exchange. Both officers were satisfied with AH's condition and the Sheriff's Department notified mother about the ex parte custody order on Saturday so that mother did not expect grandmother would return AH on Sunday morning as required by the grandparent-visitation order.

Grandmother's fiancé also testified about mother's actions during the exchange. In contradiction to the corporal's testimony that mother assaulted grandmother's fiancé, he testified that she did not hit him, but touched his arm because she was trying to enter in his vehicle.

Caldwell also testified for grandmother. Caldwell recounted what occurred during the October 9 mediation. She opined that AH should remain with the grandparents and that mother should be given services to improve.[16] Caldwell also recommended parenting time with protocols be put in place "due to safety concerns."

After grandmother rested, mother testified that her life was in Marquette and that her home was fit. Mother was "a good mother" and was not involved in an abusive relationship. Both mother and her boyfriend were looking for work and now had access to an additional vehicle. Although mother's phone was shut off on October 5, she had a Bridge card and was working on obtaining cash assistance.

Mother admitted she was on bond as a result of the criminal charges arising from her behavior during the grandparent-visitation exchange. Mother had a public defender to represent her and was hopeful the charges would be dropped.

---

[15] Previously, grandmother said that she had washed AH's clothing.

[16] There is no record of any services being provided in the guardianship case and the full record from the support matter has not been provided.

Mother's boyfriend also testified. He too asserted that the odor on AH's clothing was from marijuana he had purchased at a dispensary. He testified that mother was not unfit and AH was happy in mother's care.

Mother had an additional witness, but he was unavailable and she did not have his number.

During the hearing, AH's father stated he had no objection to the entry of the guardianship or to the custody order, and, in fact, he consented to the guardianship and to the current custody arrangement. In doing so, father voiced his opinion that AH "would be in a much safer place with her grandparents."

AH's L-GAL admitted that he had performed no further work on the file since he prepared his report on grandmother's request for a temporary guardianship. Although the L-GAL did not "have enough information to make a recommendation" and had not seen the custody order, he opined:

> I just don't see that [this situation] fits neatly in the guardianship statute. So, I think there's other ways to go about this, through the custody hearing, since that is already opened. That would have been my only recommendation; that it be handled through the custody case.

In closing, grandmother's attorney argued that the guardianship was necessary for grandmother to obtain medical treatment for AH.[17] AH was in an unsafe home due to mother's capacity and the home's cleanliness. Moreover, grandmother was willing to facilitate supervised visitation for mother.

Mother argued that she had her anger under control because she sought treatment and attended weekly counseling. The trigger for mother's anger was her family. Mother was taking medication, but would not need to do so if grandmother would leave them alone. Mother's house was clean, and, if she was not believed, CPS was welcome to check her home again. Mother questioned why father, who had not paid support since she moved, was even involved in the proceedings. AH was happy and fine with mother and grandmother had not helped mother when she needed it.

In ruling, the court began with a review of the bodycam footage of the court-ordered grandparent-visitation exchange, describing mother as "overly emotional, irrational, defiant, obstructive, threatening, . . . aggressive . . . , [and] disrespectful." Thereafter, the court denied mother's objection to the temporary custody order, ruling that ex parte order was now a temporary order governing custody. As to the guardianship, the court observed that venue and jurisdiction

---

[17] Mother had previously allowed grandmother access and authority regarding AH's medical treatment, but subsequently withdrew it. Grandmother believed such authority was necessary in case medical care was required during her grandparent-visitation and thought "it was irresponsible for [mother] to take [grandmother] off because during grandparenting time, if [grandmother] needed to bring [AH] in for medical treatment, [grandmother] would have to wait for [mother] to call or come to bring [AH] in and that was just very disturbing to [grandmother]."

were proper. To award custody, the court stated that it had to determine whether there was parental unfitness. Having heard the testimony, the court questioned mother's capacity to parent based on her history of a learning disability, anger, and ADD. Although commending mother for continuing her counseling, the court determined that her anger issues were demonstrated by the bodycam video as well as the record. The court suspected that the smell from AH's bagged clothing was animal urine, not marijuana. But, even if the odor was attributable to marijuana, there was no reason for it to be embedded in AH's clothing other than she was exposed to it. Finally, the court was concerned about the farm animals in the home and found "that, in and of itself, is reason enough to grant the guardianship." The court concluded that the guardianship was necessary to protect AH. In particular, the guardianship was required "to make it very clear to medical providers, educators, and others[] that the proposed guardian [h]as authority to act." The court then re-referred the matter to the FOC for further mediation on parenting time and directed the FOC to redirect any support order to AH's custodian or guardian until further order of the court.

## E. MOTHER'S FIRST MOTION TO TERMINATE THE GUARDIANSHIP

On March 3, 2020, mother filed a motion to terminate the guardianship. Mother alleged AH was in danger. More specifically, grandmother was verbally abusive, lacked patience, did not have time for AH due to her business, and "pawn[ed] AH off" on her aunt. Grandmother also purportedly released father from his support obligation despite outstanding support being owed.

On June 15, 2020, grandmother filed a motion to modify or suspend mother's parenting time. Grandmother reported that mother had seen AH only once at the courthouse. When telephone calls occurred, mother was upset if grandmother was in the same location as she claimed this was a violation of the PPO. Phone calls between mother and AH had been facilitated by grandmother's fiancé until mother would not stop sending text messages to harass him. Grandmother asked that visits and telephone calls be facilitated through FOC because of the harassment. Mother and her boyfriend also contacted grandmother's business associates and employers, alleging that grandmother was wrongfully keeping AH from mother. Mother's conduct interfered with the business and employment relationships of those providing care for AH. Finally, mother and her boyfriend continued to contact the local police to request welfare checks on AH.

On June 26, 2020, mother secured legal representation in both the support and guardianship cases. The parties in the guardianship case stipulated to adjourn the parties' pending motions and mediate the issue. The court entered an order consistent with their stipulation and the parties later filed a stipulation providing mother with supervised parenting time on September 16, 2020.

On January 20, 2021, the court ordered the guardianship to be continued without modification.

## F. MOTHER'S SECOND MOTION TO TERMINATE THE GUARDIANSHIP

On February 18, 2021, mother filed a second motion to terminate the guardianship, claiming it was unnecessary and void ab initio. Mother argued that her parental rights were neither terminated nor suspended by court order, and alleged she was never "provided a [p]etition or [n]otice that [her] parental rights may be suspended, nor was [she] afforded meaningful due process."

Grandmother answered that the court properly ordered guardianship under MCL 722.5204(2)(a). She asserted that father's parental rights were assigned to mother, granting mother sole physical and legal custody. Due to the issues arising from the grandparent-visitation order, grandmother filed the ex parte motion that resulted in the September 13, 2019 ex parte order granting grandmother custody.[18] That order was in effect when the court granted the guardianship.

During the March 10, 2021 hearing on mother's motion to terminate the guardianship, mother testified that she was employed, but did not want to state where due to prior interference by grandmother. The court offered to take the information through the FOC or under seal. Mother expressed that she and her boyfriend did not want people in the home because it was not theirs; however, they were looking for a separate residence. Mother had several supervised visits with AH, the last being in November 2020. The person previously supervising visitation told mother that she did not require supervision, but mother was responsible for locating a replacement supervisor and was attempting to arrange visitation in Marquette County.

The court denied mother's motion to terminate the guardianship. The court ruled that court granting the ex parte order did not err and its order was valid. The court explained that the guardianship was granted to address two major concerns: (1) AH's environment in the Marquette home, namely, the farm animals in the house and the resultant odor, and (2) mother's capacity to understand AH's needs.[19] Mother failed to take advantage of parenting time and refused to allow the GAL to enter the home because she did not own it. The court encouraged mother to locate a supervisor or work with FOC to obtain one. The court noted that it would consider terminating the guardianship if the circumstances underlying it were addressed.[20]

---

[18] In grandmother's supporting affidavit, she described her ex parte motion as one to suspend mother's parenting time and averred that mother was not denied due process given the numerous court hearings held.

[19] Marquette County CPS had investigated grandmother's complaints regarding mother's Marquette home and her care of AH. The Marquette County DHHS determined there was no need for its involvement.

[20] The court also referenced the law of the case doctrine and said mother could not challenge its prior rulings because she had not appealed them. Although mother did not appeal the court's order granting the guardianship, she was never informed she had the ability to do so. Moreover, the law of the case doctrine provides that an appellate court's decision on a particular issue binds both the lower courts and other appellate panels in subsequent appeals of the case. *Grievance Administrator v Lopatin*, 462 Mich 235, 260; 612 NW2d 120 (2000). I am unaware of any authority that provides that a court's adherence to its ruling without appeal becomes law of the case. To the contrary, "[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree, or order." *Pub Health Dep't v Rivergate Manor*, 452 Mich 495, 504; 550 NW2d 515 (1996).

## G. MOTHER'S THIRD MOTION TO TERMINATE THE GUARDIANSHIP

On August 4, 2021, mother filed a third petition to terminate the guardianship. It was nearly identical to her second motion.[21] The court denied this motion because mother failed to allege any new facts or change in circumstances since its last order. Instead, mother "appear[ed] to only desire to relitigate" previously-decided matters.

Mother appealed as of right.

## II. ANALYSIS

On appeal, mother argues that the family court's grandparent-visitation order was improper, the family court's ex parte custody order was improper, and the probate court's guardianship order was improper. More specifically, the probate court erroneously relied on the ex parte order to grant a guardianship, violating mother's constitutional right to parent without due process.

## A. THE GRANDPARENT-VISITATION ORDER

I agree with the majority that mother cannot collaterally attack the court's order granting grandmother's motion for grandparent visitation in the child support case. See *Hunter v Hunter*, 484 Mich 247, 276; 771 NW2d 694 (2009). Even if mother could do so, I further agree that MCL 722.27b(1)(d) specifically permitted grandmother to move for grandparent visitation under the circumstances presented in this case. See also *Varran v Granneman (On Remand)*, 312 Mich App 591, 615-617; 880 NW2d 242 (2015).

## B. THE EX PARTE EMERGENCY MOTION FOR CUSTODY

I also agree with the majority that mother cannot collaterally attack the court's order granting grandmother's ex parte emergency motion for custody in the child support case. *Hunter*, 484 Mich at 276.[22] Even assuming mother could challenge that order, it is unclear whether a custody dispute was involved in the child-support matter without the full record from that case. If custody was not involved, AH's grandmother would not have had standing to pursue custody independently in the circuit court. See MCL 722.26c; *Ruppel v Lesner*, 421 Mich 559; 364 NW2d 665 (1984). Moreover, even if grandmother had standing, because mother's fundamental right to parent AH was at stake, the Child Custody Act would have afforded mother numerous protections, including giving the court the ability to appoint counsel, MCL 722.26e, and requiring the court to weigh all of the best-interest factors, MCL 722.23, and apply the presumption that AH's best interests were "served by awarding custody to her parent or parents, unless the contrary [was] established by clear and convincing evidence." MCL 722.25(1). See also *In re Guardianship of*

---

[21] Mother contends that she "was not in a position to immediately appeal" the court's prior order denying her second motion, but does not elaborate. Mother also argues that "in light of [*In re*] *Orta*, it is a difference without distinction." But see *In re Guardianship of Orta*, 508 Mich at 851 n 11 (VIVIANO, J., dissenting).

[22] By the time mother retained counsel, it was too late to appeal that order. MCR 7.205(D)(4)(a).

*Versalle*, ___ Mich ___ , ___; 972 NW2d 846 (2022) (WELCH, J., concurring) (discussing the possibility there will be cases in which the Child Custody Act, 722.21 *et. seq.*, provides a parent with more protection than the guardianship statute).

## C. STATUTORY REQUIREMENTS FOR A GUARDIANSHIP

Lastly, mother contends that MCL 700.5204(1)(a) requires a "prior court order" establishing that "the parental rights of both parents or the surviving parent are terminated or suspended[.]" Mother asserts that this language "clearly contemplates a child protective proceeding [under the Juvenile Code, MCL 712A.1 *et. seq.*,] or the like, and does not contemplate a guardianship, custody dispute, or [] grandparent visitation." Mother reasons that the procedural safeguards afforded parents in child-protective proceedings under the Juvenile Code, including the right to counsel and the clear-and-convincing burden of proof, safeguard a parent's due process rights unlike the other types of proceedings.

"Statutory interpretation is a question of law that this Court reviews de novo." *Deschaine v St Germain*, 256 Mich App 665, 669; 671 NW2d 79 (2003). "The primary goal of judicial interpretation of statutes is to ascertain the Legislature's intent." *Id*. "The first step in determining intent is examining the specific language of the statute." *Id*. "Our Legislature is presumed to have intended the meaning it plainly expressed." *Id*. "Judicial construction is permitted only if the language is ambiguous or unclear." *Id*.

Anyone interested in the welfare of a minor may file a petition for guardianship. MCL 700.5204(1). The court, however, may only appoint a guardian for an unmarried minor when:

(a) The parental rights of both parents or the surviving parent are terminated or suspended by prior court order,[23] by judgment of divorce or separate maintenance, by death, by judicial determination of mental incompetency, by disappearance, or by confinement in a place of detention.

(b) The parent or parents permit the minor to reside with another person and do not provide the other person with legal authority for the minor's care and maintenance, and the minor is not residing with his or her parent or parents when the petition is filed.

(c) All of the following:

(*i*) The minor's biological parents have never been married to one another.

(*ii*) The minor's parent who has custody of the minor dies or is missing and the other parent has not been granted legal custody under court order.

---

[23] A minor's limited guardian may petition to be appointed the minor's guardian, but the limited guardian's petition cannot "be based upon suspension of parental rights by the order that appointed that person the limited guardian for that minor." MCL 700.5204(3).

(*iii*) The person whom the petition asks to be appointed guardian is related to the minor within the fifth degree by marriage, blood, or adoption. [MCL 700.5204(2).]

Grandmother submitted the ex parte emergency order granting temporary custody pending hearing in the support case as the prior court order suspending mother's parental rights as the basis for grandmother's guardianship petition. The probate court relied on this ex parte order to grant the guardianship.

As mother recognizes, the family court has jurisdiction to suspend or terminate parental rights under the Juvenile Code. See MCL 600.1021(1)(e), MCL 712A.19b, and MCL 712A.20. Other statutes, however, also permit the family court to terminate parental rights. See e.g., MCL 710.37, MCL 710.39 and MCL 710.51 (termination of a parent's parental rights under the Adoption Code, MCL 710.21 *et. seq.*); MCL 712.17(5) (termination of parental rights under the Safe Delivery of Newborns Law, MCL 712.1 *et. seq.*). A probate court may also suspend parental rights with a parent's consent under a limited guardianship.[24] See MCL 700.5205. Moreover, the plain statutory language is unambiguous and provides that parental rights may be terminated or suspended "by judgment of divorce or separate maintenance" as well as "by judicial determination of mental incompetency, by disappearance, or by confinement in a place of detention."

In addition, nearly a year after the trial court's initial decision in this case, this Court held that "[a] parent's constitutional right to raise his or her child is also applicable in the guardianship context." *In re Guardianship of Versalle*, 334 Mich App 173, 179; 963 NW2d 701 (2020). This Court explained that

"[p]arents have a constitutionally protected right to make decisions about the care, custody, and management of their children." *Zawilanski v Marshall*, 317 Mich App 43, 49; 894 NW2d 141 (2016). Although this right is not absolute, the United States Constitution imparts " 'a presumption that fit parents act in the best interest of their children' and that 'there will normally be no reason for the State to inject itself into the private realm of the family' " by questioning the ability of fit parents to make the best decisions concerning the raising of their children. *Id.*, quoting *In re Sanders*, 495 Mich 394, 410; 852 NW2d 524 (2014), quoting *Troxel v Granville*, 530 US 57, 68-69; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (opinion by O'Connor, J.). A "fit parent" has been defined "as a parent who 'adequately cares for his or her children.' " *Geering v King*, 320 Mich App 182, 190-191; 906 NW2d 214 (2017), quoting *Troxel*, 530 US at 68. "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 US at 72-73 (opinion by O'Connor, J.). However, "the state has a legitimate interest in protecting the moral, emotional, mental, and physical welfare

---

[24] See footnote 23.

-12-

of the minor." *Geering*, 320 Mich App at 188 (quotation marks and citations omitted). [*In re Guardianship of Versalle*, 334 Mich App at 177.]

See also *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . .").

Under MCL 700.5204(1)(a), an individual petitioning for guardianship over a minor has the opportunity to overcome the presumption that the parent is fit by presenting a "prior court order" that evinces "[t]he parental rights of both parents or the surviving parent are terminated or suspended." Unlike an order terminating or suspending parental rights, however, the family court's ex parte order granting temporary custody was explicitly conditioned upon a hearing due to mother's objection. MCR 3.207(B) and (C)(2). The hearing was necessary to protect mother's fundamental right to direct the care, custody, and control of her child while ensuring the health and safety of the child. See *In re Sanders*, 495 Mich at 412, quoting *Stanley v Illinois*, 405 US 645, 658; 92 S Ct 1208; 31 L Ed 2d 551 (1972) ("all parents 'are constitutionally entitled to a hearing on their fitness before their children are removed from their custody.' "). Thus, the ex parte temporary order pending a future hearing on unproven averments was insufficient to establish mother's parental rights were suspended until the required hearing was held and the court's temporary order was actually entered.[25]

Accordingly, consistent with my position in *In re Orta* and under the circumstances presented in this case, I conclude mother could challenge the probate court's initial guardianship order because the statutory requirements for establishing the guardianship were not met, namely, there was no prior court order suspending or terminating mother's and father's parental rights.[26]

---

[25] As the initially-appointed lawyer-guardian ad litem representing AH, observed at the combined hearing:

> I just don't see that [this situation] fits neatly in the guardianship statute. So, I think there's other ways to go about this, through the custody hearing, since that is already opened. That would have been my only recommendation; that it be handled through the custody case.

Indeed, if grandmother was awarded custody, a guardianship seems superfluous.

[26] The guardianship statute requires that the rights of "both parents or the surviving parent are terminated or suspended by prior court order." MCL 700.5204(1)(a). Grandmother produced no such order in this case as to father.

For these reasons, I would vacate the probate court's guardianship order. Regardless, I share the concerns raised by the concurring Justices in *In re Guardianship of Orta*. Legal representation for mother from the outset could have made a difference here.[27]

/s/ Anica Letica

---

[27] Although mother's understandable frustration over the ex parte process that parlayed into both custody and guardianship orders, I, like the trial court, encourage mother to permit the guardian ad litem to inspect her residence, to present evidence that she is capable of parenting and has addressed her anger issues, and to arrange for and participate in consistent supervised visitation with AH. If mother still has the benefit of retained counsel perhaps he can assist her moving forward in both matters.

If not, grandmother previously testified that she was "not trying to . . . take [AH] as [her] child" and that she would facilitate a relationship between mother and AH. With that in mind, perhaps the FOC can assist mother with arranging in-person visitation in Marquette County that will comply with grandmother's PPO and not require mother to travel 160 miles.